UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ANTHONY PARKER,

Petitioner,

v.

ISIDRO BACA, *et al.*,

Respondents.

Case No. 3:17-cv-00442-MMD-WGC

ORDER

## I.    SUMMARY

This petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, filed by Anthony Parker, is before the Court for adjudication of the merits of Parker's remaining claims. As further explained below, the Court denies Petitioner's habeas petition, denies him a certificate of appealability, and directs the Clerk of the Court to enter judgment accordingly.

## II.    BACKGROUND

The victim, a nineteen-month old boy, was in the care of Petitioner, the victim's mother's boyfriend, when he suffered fatal blunt force injuries to the head. (ECF No. 9-2 at 15, 22, 148.) Although he later gave several inconsistent accounts of the events that lead to the victim's death, Petitioner initially told the police that he was talking a bath with the victim, and when he went to get out of the bathtub, he lost his balance causing the victim to fall and strike his head on the bathtub. (*Id.* at 33; ECF No. 11-11 at 34-35.) The medical examiner determined that this version of events was inconsistent with the victim's injuries. (ECF No. 9-2 at 23.)

On July 22, 2009, Petitioner was indicted on charges of first-degree murder, second-degree murder, and child neglect causing substantial bodily harm. (ECF No. 9-3.)

1   Petitioner stood mute at the arraignment hearing, and a not guilty plea was entered on his

2   behalf. (ECF No. 9-7 at 5.) On September 2, 2010, Petitioner changed his plea, pleading

3   guilty to second-degree murder pursuant to a plea agreement. (ECF No. 10-5, 10-6.)

4   Petitioner was sentenced to life with the possibility of parole after ten years. (ECF No. 10-

5   8, 10-9.) Petitioner appealed, and the Nevada Supreme Court affirmed the judgment of

6   conviction on October 5, 2011. (ECF No. 11.)

7           Petitioner filed a state habeas petition, a supplemental petition, and a second-

8   supplemental petition on December 30, 2011, June 17, 2013, and June 3, 2014,

9   respectively. (*See* ECF No. 11-6.) After an evidentiary hearing held on May 29, 2015, the

10  state district court denied the petition. (ECF No. 11-11, 11-17, 11-18.) The Nevada Court

11  of Appeals affirmed the denial of the petition on August 16, 2016. (ECF No. 11-33.)

12          Petitioner dispatched his federal habeas petition on or about July 18, 2017. (ECF

13  No. 6.) Respondents moved to dismiss Ground Three and Ground Four. (ECF No. 8.) The

14  Court granted Respondents' motion. (ECF No. 12.) In the two remaining grounds,

15  Petitioner asserts the following violations of his federal constitutional rights:

16          1.      The state district court abused its discretion by denying his state
                    habeas petition because he demonstrated that his trial counsel was
17                  ineffective when she coerced him into pleading guilty.

18          2.      His trial counsel was ineffective because she failed to investigate and
                    present mitigating evidence at his sentencing hearing.
19

20  (ECF No. 6.) Respondents filed an answer to these remaining grounds on February 20,

21  2018. (ECF No. 13.) Petitioner did not file a reply.

22  **III.    LEGAL STANDARD**

23          28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in

24  habeas corpus cases under the Antiterrorism and Effective Death Penalty Act

25  ("AEDPA"):

26          An application for a writ of habeas corpus on behalf of a person in custody
            pursuant to the judgment of a State court shall not be granted with respect
27          to any claim that was adjudicated on the merits in State court proceedings
            unless the adjudication of the claim --
28

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## IV.    DISCUSSION

Petitioner's remaining allegations concern the effectiveness of his trial counsel. (*See* ECF No. 6 at 3, 7.) In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. *Id.* at 697.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel, under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104-05. In *Harrington*, the United States Supreme Court instructed:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*[*v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with

4

unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'").

## A.    Ground One

In Ground One, Petitioner argues that his federal constitutional rights were violated when the state district court denied his state habeas petition because he demonstrated that he was denied effective assistance of counsel. (ECF No. 6 at 3.) Specifically, Petitioner asserts that his plea was not knowing or voluntary because his trial counsel coerced him into pleading guilty with her comment that he "would leave prison in a 'pine box'" and failed to discuss possible defenses with him. (*Id.* at 3-5.)

In Petitioner's state habeas appeal, the Nevada Court of Appeals held:

> Parker argues his counsel was ineffective for coercing him into pleading guilty. Parker asserts counsel coerced his plea by failing to communicate the appropriateness of an accident defense and by failing to investigate possible defenses. Parker also asserts counsel coerced his plea by informing him he would leave prison in a "pine box" if he chose to proceed to trial. Parker failed to demonstrate his counsel's performance was deficient or resulting prejudice.

> At the evidentiary hearing, counsel testified she discussed possible defenses with Parker and informed Parker he was likely to be convicted of first-degree murder if he went to trial. Counsel testified this was due to the child victim, the nature of the victim's injuries, and due to Parker's inconsistent statements regarding the incident at issue. Counsel also testified she investigated whether an accident defense would have been viable by retaining two experts to review the medical evidence in this matter, but neither expert provided information which could have been helpful to the defense. Counsel further testified she explained to Parker that a first-degree murder conviction carried the possibility of a sentence of life in prison without the possibility of parole. The district court concluded the testimony presented at the evidentiary hearing demonstrated Parker's trial counsel was diligent and gave frank and honest advice regarding this case. Substantial evidence supports this conclusion.

> Further, Parker acknowledged in the written plea agreement that he did not act under duress or coercion and asserted at the plea canvass that he

entered his guilty plea of his own free will. Parker also acknowledged in the written plea agreement and at the plea canvass that he had discussed possible defenses with his counsel.

Given the record before this court, there was substantial evidence of Parker's guilt. Accordingly, Parker fails to demonstrate a reasonable probability he would have refused to plead guilty and would have insisted on going to trial had counsel had different discussions with him regarding use of an accident defense at trial, had conducted further investigation into this matter, or explained the sentence he faced had he gone to trial in a different manner. Therefore, we conclude the district court did not err in denying this claim.

(ECF No. 11-33 at 3-4.)

On September 2, 2010, at Petitioner's change of plea hearing, Petitioner's trial counsel explained that Petitioner would "be entering a plea of guilty . . . to second-degree murder" pursuant to a plea agreement and that Petitioner "underst[ood] that his options are either life in prison [with] parole eligibility in 10 years or a set term of 25 [years] with parole eligibility in 10 [years]." (ECF No. 10-5 at 4.) In response to the state district court's canvass, Petitioner stated that he was "comfortable with the representation [he had] received so far," that he read and understood the plea agreement, that the possible maximum penalty was "life with the possibility of parole in 10 years," that he was not threatened to enter his plea, that he was not told by anyone that he "would be guaranteed any particular result if [he] pled guilty," that he understood that the state district court could "sentence [him] up to and including the maximum allowed by law," that no one "made any statements or representations to get [him] to enter this plea," that he "fe[lt] like [he] had ample opportunity to discuss all of [his] defenses with his attorney," and that he was "entering this plea of [his] own free will." (*Id.* at 5-10.) The state district court accepted Petitioner's plea, finding it to be voluntary. (*Id.* at 10.)

The plea agreement, which was signed by Petitioner the same day, September 2, 2010, similarly provided that Petitioner "considered and discussed all possible defenses and defense strategies with [his] counsel," that he understood that he "may be imprisoned for a period of life or 25 years . . . with parole after 10 years," that he understood that "the matter of sentencing is to be determined solely by the Court," that

the "possible penalties . . . [were] carefully explained to [him] by [his] attorney," that he was "satisfied with [his] counsel's advice and representations leading to th[e] resolution of [his] case," that his "plea of guilty [was] voluntary and [was] not the result of any threats, coercion or promises of leniency," and that he signed the plea agreement "under no duress, coercion, or promises of leniency." (ECF No. 10-6 at 4-6.)

At the May 29, 2015, postconviction evidentiary hearing, Petitioner testified that he did not trust his trial counsel, in part, because he "felt bullied" by his trial counsel's investigator, that his trial counsel informed him that "the evidence . . . [was]n't consistent with" an accidental death, and that his trial counsel never showed him any reports from a defense witness. (ECF No. 11-11 at 65, 69, 71.) When his trial counsel first contacted him "with the plea deal of ten to life," Petitioner testified that he "felt like [he] was being pressured into the deal." (*Id.* at 70.) Petitioner explained why he eventually took the plea deal:

> I was going to take it to trial because I was not - - I did not want to sit up on the stand and say something I did that I didn't do. So I was advised that if I didn't take the deal, that I would never see daylight. And that was very scary to me. And I love my family. I love my kids. I didn't want to be locked up for the rest of my life. And so, therefore, coming to an agreement, which at first I wasn't in agreement at all to that, I wasn't in agreement to ten to life. It didn't seem like much of [a] deal for ten to life. If I signed a deal on for ten to twenty-five, I would have got ten to life anyways.

(*Id.* at 71-72.) Petitioner elaborated that he felt coerced by his trial counsel to plead guilty:

> Just the way her actions were telling me the case was weak for me. That the doctor she said she hired, I didn't see any proof of that. I didn't read any documents. So, therefore, I was hesitant of even listening to what she had to say. I was hinging most of my case on that forensic pathologist because they can determine that. Her saying it didn't look good for me. Yeah, it [sic] scary, but also scary to me if I didn't take a deal I was going to die. I was going to die in the Nevada State Prison. Her exact words were I was going to leave in a pine box is how I was going to leave the Nevada State Prison. I would be wise to sign the deal.

(*Id.* at 72.) Petitioner testified that when he asked his trial counsel about withdrawing his plea, his trial counsel "said it would be in [his] best interest not to, to take the deal and stay with it." (*Id.* at 74.)

///

7

Regarding the plea agreement, Petitioner explained that it "wasn't described very well" and that "[he] wasn't in complete understanding of the plea agreement." (*Id.* at 85.) Petitioner acknowledged that he should have told the state district court that he was uncomfortable with his trial counsel, but he explained that he "was intimidated and scared," "pressured," and "under duress." (*Id.* at 86-87.)

Petitioner's trial counsel testified that Petitioner initially wanted to go to trial because the victim's death was accidental. (ECF No. 11-11 at 19, 21.) Petitioner's trial counsel explained that she conveyed the plea offer to Petitioner, he rejected it, she wrote him a letter explaining that "it was [her] advice he take the deal," she discussed the offer with Petitioner a second time a few months later, she sent him another letter "telling him, again, it was [her] advice he take the" offer, and Petitioner again rejected the offer. (*Id.* at 22.) Following that second rejection, Petitioner "said to [her] that he wanted to take the deal," so she contacted the State to convince it to put the offer "back on the table." (*Id.* at 22.) The State would not initially agree to put the offer back on the table, but after she spoke with Petitioner to make sure he was serious about wanting the deal, she "talked to [the State] and [it] finally agreed to" offer second-degree murder once again. (*Id.* at 22-23.)

Petitioner's trial counsel testified that she never threatened Petitioner, never coerced Petitioner, and did not recall having a conversation that involved the term "pine box." (*Id.* at 23-24.) Instead, Petitioner's trial counsel "told him if he went to trial and [was convicted of first-degree murder], he was facing the possibility of life without parole, and that is what life without parole means, you spend the rest of your life in prison" and "die in prison." (*Id.* at 24, 28, 39.) Petitioner's trial counsel informed Petitioner "that there would be a strong likelihood he would be convicted of first degree murder based upon the severity and nature and location of the injuries to the little boy's head." (*Id.* at 28.) She elaborated:

> When a child dies, somebody, jurors, want to hold somebody accountable. They don't want to think a child just slipped and fell and died. There is a huge emotional toll on jurors, and when the child is in the care of the

8

mother's boyfriend, I think it makes it especially difficult, again, given the
nature of the child's injuries.

(*Id.* at 34.) Petitioner's trial counsel also explained that she believed Petitioner would be convicted of first-degree murder if the case went to trial because Petitioner told numerous inconsistent stories:

> Sometimes it was he stepped ou[t] of the tub himself and fell. Sometimes he was cradling him, stepped out of the shower with him, fell on loose tile, fell on top of the child. Another time he was holding him, he slipped out of his arms. Sometimes he was in the bath, sometimes in the shower. None of the physical evidence when REMSA arrived was consistent with either Tony or the child coming out of the bathtub. At one point, he said the child had a seizure. Other times the child had a bloody nose.

(*Id.* at 34-35.)

Petitioner's trial counsel explained that if the case had gone to trial, her defense would have been "that it was an accident." (*Id.* at 26.) In an attempt to support that defense, Petitioner's trial counsel retained two experts, Dr. Terri Haddix and Dr. Todd Grey, "concerning the actual cause of death." (*Id.* at 26-27.) However, "[n]either expert would have been able to say anything that was in the least bit beneficial." (*Id.* at 35.) Indeed, because "there [were] injuries to both sides of the child's head," neither expert was able to offer "any non-crime hypothesis that would explain all the injuries." (*Id.* at 36.) Petitioner's trial counsel testified that she informed Petitioner of the experts' opinions. (*Id.* at 26-27.)

In an apparent attempt to dispute that an expert was unable to provide testimony that the victim's death was accidental, Petitioner's postconviction counsel called Dr. Amy Llewellyn, a pathologist, to testify at the postconviction evidentiary. (*See id.* at 7.) Dr. Llewellyn testified that she "read the autopsy report and reviewed the diagrams[,] . . . autopsy photos[,] . . . scene of the accident or incident photos[,] . . . [and] Grand Jury testimony of" the medical examiner in coming to her conclusion that "it [was] possible that the injury to the child occurred during an accidental fall." (*Id.* at 10, 17.) However, Dr. Llewellyn also testified that she did not have "a hypothesis that would cover all the injuries to the child." (*Id.* at 18.)

The federal constitutional guarantee of due process of law requires that a guilty plea be knowing, intelligent, and voluntary. *See Brady v. United States*, 397 U.S. 742, 748 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011). "The voluntariness of [a petitioner's] plea can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749. Addressing the "standard as to the voluntariness of guilty pleas," the Supreme Court has stated:

> (A) plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady*, 397 U.S. at 755 (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1957), *rev'd on other grounds*, 356 U.S. 26 (1958)); *see also United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) ("A waiver is voluntary if, under the totality of the circumstances, [it] was the product of a free and deliberate choice rather than coercion or improper inducement."). Although a plea may not be produced "by mental coercion overbearing the will of the defendant," a guilty plea made following "the post-indictment accumulation of evidence [that] convince[s] the defendant and his counsel that a trial is not worth the agony and expense to the defendant and his family" is not "improperly compelled." *Brady*, 397 U.S. at 750 (reasoning that "mental coercion" is only found if the defendant "did not or could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty"). Accordingly, a guilty plea is not rendered invalid when it has been "motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged." *Id.* at 750.

Petitioner testified that that he felt coerced to take the State's plea offer because his trial counsel advised him that he "would never see daylight" and would "leave [prison]

10

in a pine box" if he did not take the offer. (ECF No. 11-11 at 72.) Although Petitioner's trial counsel did not recall using the term "pine box" when speaking to Petitioner, she testified that she did, in fact, convey to him that he would "die in prison" if he was convicted of first-degree murder because he would be facing a life without parole sentence. (*Id.* at 24, 28, 29.) Petitioner's trial counsel based her assessment that "there would be a strong likelihood [Petitioner] would be convicted of first degree [sic] murder" on the victim's age, the victim's injuries, and Petitioner's inconsistent stories. (*Id.* at 28, 34-35.) Petitioner's trial counsel's statements that Petitioner interpreted as being coercive appear to be candid statements about her evaluation of his case and her steadfast advice that a second-degree murder plea deal would be in Petitioner's best interest. *See Iaea v. Sunn*, 800 F.2d 861, 867 (9th Cir. 1986) ("Mere advice or strong urging by third parties to plead guilty based on the strength of the state's case does not constitute undue coercion."); *see also United States v. Juncal*, 245 F.3d 166, 172 (2d Cir. 2001) ("[D]efense counsel's blunt rendering of an honest but negative assessment of appellant's chances at trial, combined with advice to enter the plea, [did not] constitute improper behavior or coercion that would suffice to invalidate a plea."). Therefore, it cannot be concluded that Petitioner's plea was the result of mental coercion; rather, it appears that his guilty plea was motivated by his desire to avoid the possibility of being sentenced to life in prison without the possibility of parole, a fact that was delineated in a straightforward nature to Petitioner by his trial counsel. *See Brady*, 397 U.S. at 750 (concluding that "there [is no] evidence that Brady was so gripped by fear of the death penalty or hope of leniency that he did not or could not, with the help of counsel, rationally weigh the advantages of going to trial against the advantages of pleading guilty").

It is worth noting that Petitioner's allegation of improper coercion on the part of trial counsel is rebutted by (1) the fact that he contacted his trial counsel about accepting the plea offer after his previous two rejections (ECF No. 11-11 at 22.); (2) the statements he made to the state district court during the change of plea canvass (ECF No. 10-5 at 5-10 (indications by Petitioner that he was "comfortable with the representation [he had]

received so far," that he was not threatened to enter his plea, that no one "made any statements or representations to get [him] to enter this plea," and that he was "entering this plea of [his] own free will").); and (3) the terms of the signed plea agreement (ECF No. 10-6 at 5-6 (indications by Petitioner that he was "satisfied with [his] counsel's advice and representations leading to th[e] resolution of [his] case," that his "plea of guilty [was] voluntary and [was] not the result of any threats, coercion or promises of leniency," and that he signed the plea agreement "under no duress, coercion, or promises of leniency").) *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (noting that the defendant's representations, "as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings" and that "[s]olemn declarations in open court carry a strong presumption of verity"); *see also Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012) ("Petitioner's statements at the plea colloquy carry a strong presumption of truth."). Because there was no improper coercion, Petitioner's trial counsel's "representation [did not] f[a]ll below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

Turning next to Petitioner's contention that his plea was not knowing or was involuntary because his trial counsel failed to discuss possible defenses with him, this contention is belied by the record. Petitioner only testified that his trial counsel never showed him any report from a potential defense witness and informed him that the evidence was not consistent with the victim's death being accidental. (ECF No. 11-11 at 69, 71.) However, these facts fail to demonstrate that his trial counsel did not discuss possible defenses with him. Petitioner's trial counsel testified that she would have presented an accidental defense at trial, and, to support that defense, she retained two experts. (*Id.* at 26-27.) Unfortunately, those experts were not able to provide anything beneficial (*id.* 35.), which is bolstered by Dr. Llewellyn's testimony that she was unable to come up with "a hypothesis that would cover all the injuries to the child." (*Id.* at 18.) Although Petitioner's trial counsel may not have provided any physical reports to Petitioner, if they even existed, she informed Petitioner of the experts' opinions. (*Id.* at 26-

27.) Moreover, Petitioner acknowledged during the change of plea hearing that he "fe[lt] like [he] had ample opportunity to discuss all of [his] defenses with his attorney" (ECF No. 10-5 at 9.), and in his plea agreement that he "considered and discussed all possible defenses and defense strategies with [his] counsel" (ECF No. 10-6 at 4.). Accordingly, the record supports the fact that Petitioner's trial counsel discussed possible defenses with him, investigated an accidental defense theory, and was prepared to present that defense at trial. As such, Petitioner's trial counsel's "representation [did not] f[a]ll below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

In sum, the Nevada Court of Appeals' ruling that " Petitioner failed to demonstrate his counsel's performance was deficient" (ECF No. 11-33 at 3.), was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d). The Court will deny Petitioner habeas corpus relief with respect to Ground One.[1]

///

---

[1]To the extent that Petitioner argues that his trial counsel was ineffective for failing to advise him that he could be sentenced to life with the possibility of parole, such a contention is meritless. Although Petitioner testified at the postconviction evidentiary hearing that he "was not aware [he] was going to do a life sentence," Petitioner acknowledged that the plea deal and the state district court notified him that a life sentence was possible and that his trial counsel informed him that "[t]he Judge could offer ten to life." (ECF No. 11-11 at 74, 82, 84; *see also* ECF No. 10-5 at 7-8 (indications by Petitioner at the change of plea hearing that the possible maximum penalty is "life with the possibility of parole in 10 years" and that he understood that the state district court could "sentence [him] up to and including the maximum allowed by law"); ECF No. 10-6 at 4-5 (indications by Petitioner in the plea agreement that he understood that he "may be imprisoned for a period of life or 25 years," that he understood that "the matter of sentencing is to be determined solely by the Court," and that the "possible penalties . . . [were] carefully explained to [him] by [his] attorney").) Thus, because Petitioner was aware of the fact that the state district court could sentence him to life with the possibility of parole instead of a definite term of twenty-five years, Petitioner's trial counsel's "representation [did not] f[a]ll below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also Brady,* 397 U.S. at 756 ("[C]onclu[ding] that Brady's plea was intelligently made" because "[h]e was advised by competent counsel, he was made aware of the nature of the charge against him, and there was nothing to indicate he was incompetent or otherwise not in control of his mental faculties."); *cf. Iaea,* 800 F.2d at 866 ("A guilty plea is invalid if a defendant does not understand the charges against him or the possible punishment he faces.").

## B. Ground Two

In Ground Two, Petitioner argues that his federal constitutional rights were violated by his trial counsel's ineffectiveness at his sentencing hearing. (ECF No. 6 at 7.) Specifically, Petitioner asserts that his trial counsel failed to investigate and present mitigating evidence at his sentencing hearing, including documentation of his trivial improper behavior at the Washoe County Jail. (*Id.* at 7, 9.) Petitioner also contends that his sentence was constitutionally excessive. (*Id.*)

In Petitioner's appeal of his judgment of conviction, the Nevada Supreme Court held:

> Parker contends that the district court improperly imposed a harsher sentence based on its finding that he failed to accept responsibility for the crime. We discern no abuse of discretion. *See Randell v. State*, 109 Nev. 5, 8, 846 P.2d 278, 280 (1993) (recognizing sentencing court has wide discretion). While the district court noted that it did not "hear that [Parker] truly accepted full responsibility," the court did not appear to base its sentencing decision entirely on this observation. Instead, the district court relied more heavily on Parker's prior criminal history and behavior in jail. *See Denson v. State*, 112 Nev. 489, 492, 915 P.2d 284, 286 (1996) (providing that reversal of sentencing decision required where sentence "supported *solely* by impalpable and highly suspect evidence").

(ECF No. 11 at 2-3.) In Petitioner's state habeas appeal, the Nevada Court of Appeals held:

> Parker argues his trial counsel was ineffective during the sentencing hearing because counsel failed to present mitigation evidence regarding Parker's disciplinary issues while he was housed in the county jail. During the sentencing hearing, the parties discussed the multiple disciplinary infractions committed by Parker while housed in the county jail. Parker argues counsel should have obtained the jail documents discussing the disciplinary issues as those documents would have demonstrated many of the issues concerned trivial matters. Parker failed to demonstrate his counsel's performance was deficient or resulting prejudice.
>
> A review of the record reveals a number of Parker's disciplinary infractions involved him acting in a threatening manner towards jail staff members. Given the nature of those disciplinary infractions, Parker does not demonstrate objectively reasonable counsel would have argued Parker's jail behavior was appropriate or should not have been weighed against him when the court imposed sentence. *See Denson v. State*, 112 Nev. 489, 492, 915 P.2d 284, 286 (1996). In addition, the district court determined that the information Parker provided during the postconviction proceedings would not have resulted in a different sentence had counsel introduced it during the sentencing hearing. Substantial evidence supports that determination. Therefore, we conclude the district court did not err in denying this claim.

(ECF No. 11-33 at 4-5.)

Prior to his sentencing, Petitioner's trial counsel submitted twenty letters of support written by Petitioner's friends and family. (*See* ECF No. 10-7.) Two additional letters were admitted at the sentencing hearing. (*See* ECF No. 10-8 at 5-6.) At the sentencing hearing, Petitioner's trial counsel summarized the letters and chronicled Petitioner's support:

> They're letters from his mother, who is present in the courtroom. She has come from Wisconsin, and some other family members, who have traveled from Wisconsin as well. His brother, James, is present as well. You can see there's almost a dozen people who are here in support of Tony Parker. And those are the people that have come from all the way across the country to be here to show him that they love him and they care about him because they know what kind of man he is, and the kind of man he is is not reflected in the Department of Parole and Probation's report.
>
> In the letters, there's a theme you see throughout almost all of the letters. Tony's got some rough edges, absolutely. But Tony is a man of compassion, Tony is a man of tenderness. Tony is a man who has always loved children and been loved by children. It was amazing to me that over and over, they said: I would trust Tony with my children. Tony was so good with my kids. My Uncle Tony, gosh, he was so wonderful. They would describe: He would ride bikes. Tony would go to the pool. Tony would play ball. Tony would get down on his hands and knees and play with the kids because he loved them. And also of note was what he was telling his friends and family members after he and Charlotte became involved. He was excited about Charlotte, but gosh, he was just thrilled to have [the victim] in his life. He was so excited to have a little boy that he could help raise. And he loved [the victim]. He is certainly capable of parental love because you see that parental love. The letters present a Tony Parker that is not reflected in the crime that he was charged with.

(*Id.* at 11-12.) Petitioner's trial counsel explained that his family and friends "are in a position to really know what kind of man Tony Parker is" and that she did not believe she had "ever had a client who had that much support from loving family, who had this many people come from the distance that they've come." (*Id.* at 34.)

During the sentencing hearing, Petitioner's trial counsel downplayed his "handful of misdemeanor convictions" by arguing that those convictions occurred "when he was younger, but he had outgrown those." (*Id.* at 7.) Petitioner's trial counsel also highlighted the fact that Petitioner had a limited education, exhibited development issues, and lacked a father figure. (*Id.* at 9-10.) In an attempt to soften the evidence of the victim's death,

Petitioner's trial counsel explained that Petitioner was frightened after the victim's death, that he always maintained that he never meant to intentionally hurt the victim, and that he has accepted responsibility. (*Id.* at 12-13.) Further, Petitioner's trial counsel attempted to mitigate his jail infractions:

> The other thing that's noted in the Department of Parole and Probation's report is my client's behavior in jail, and I want to address that briefly. Tony Parker is a big man. And he is a man who, because of his size, can intimidate people through no fault or intention on his part. It's just a matter of who he is and how big he is. When he went to the jail, he was absolutely terrified. He went to the jail on a charge that he had never in a million years imagined he'd ever be arrested for on, and I think he went to the jail frightened and developed a little bit of a persona. Your Honor, if a way to try to protect himself from what he believed would be the horrors of incarceration. Once that happened, the first eight months, he was discipline-free. The disciplinary actions came later in his incarceration when he was moved from one unit to another. He was moved into a unit with more serious offenders: people who were in protective custody, people who were there on child sexual assault and murder cases. And so I think almost instinctively, he just was kind of toughening himself up in an effort to prepare himself for life in prison, and he had a problem with a couple of deputies. And once that happened, it was just downhill from there. Those disciplinary infractions are not indicative of the type of man Tony Parker is, nor the type of inmate that he will be in the future.

(*Id.* at 8-9.) Petitioner's trial counsel concluded her sentencing argument by requesting a sentence of ten to twenty-five years imprisonment. (*Id.* at 13-14.)

Before sentencing Petitioner to "life in the Nevada Department of Corrections with possibility of parole after . . . serv[ing] a minimum of ten years," the state district court reasoned:

> I, too, was impressed by the number of letters in support and the people who have traveled so far in support of Mr. Parker. That is unusual and unique. But, there has been a terrible death, one that cannot be made up for by friends and family or their being there to support you. I am concerned about your criminal history. Even those things that you admit to as well as your adjustment since you've been in the jail, those things are to be considered when I make a decision about your sentence. I also did not hear - - the process that you are going through, I did not hear that you have truly accepted full responsibility. I know that you've accepted responsibility by pleading guilty, but there seems to be a theme that it was still an accident. And maybe that was what it was. I don't know. But I do know a defenseless child is dead, and you are the one who has accepted responsibility, and under the law, you are the responsible party.

(*Id.* at 36-37.)

///

16

Nearly five years later at the postconviction evidentiary hearing, Petitioner testified that he believed his family members were going to and should have spoken at the sentencing hearing. (ECF No. 11-11 at 65, 78.) Petitioner also testified that he received "some write-ups at the jail" but that they were for trivial issues, such as not having socks on, having too many bibles, "having pictures on the wall of his family," "having extra pillow cases or extra socks," and "hitting the intercom to ask them a question." (*Id.* at 75-76.) Petitioner notified his trial counsel of the nature of these infractions. (*Id.* at 76.) Petitioner's postconviction counsel also confirmed that "many of the incidents were fairly insignificant, having extra clothes, an extra sheet, having a pillow case, that type of thing." (*Id.* at 40.)

Petitioner's trial counsel testified that she "talked to [Petitioner] about the fact his disciplinary records at the jail would potentially come up at sentencing and follow him to the [prison] so he needed to be very careful how he behaved." (*Id.* at 29-30.) She also explained that she "knew a lot of [the disciplinary records] were minor, but there were 20 of them" and she "didn't want to go into too much detail" because if she "turned over too many rocks, more stuff comes crawling out." (*Id.* at 30.)

In preparation for sentencing, Petitioner's trial counsel testified that she retained Dr. Martha Mahaffey, who conducted an evaluation and wrote a report; spoke with Petitioner's brother, James Parker; spoke with Petitioner's mother; interviewed the victim's mother, Charlotte Stewart; and interviewed the "prior bad act witnesses." (*Id.* at 28.) Regarding the potential testimony of Petitioner's friends and family at the sentencing hearing, Petitioner's trial counsel stated that she "asked them before court if anyone wanted to testify," but "[n]obody said they wanted to at the time." (*Id.* at 31-32.) However, she also explained that she would rather rely on letters than testimony "[b]ecause you know what they are going to say" when a letter is submitted, but "you don't have control over what information" when a witness is on the stand. (*Id.* at 32-33.)

Petitioner's postconviction counsel presented the testimony of various family members and friends at the postconviction evidentiary hearing: James Parker,

Petitioner's brother; Peter Thomet, Petitioner's brother; Scott Parker, Petitioner's brother; Alishia Ford, Petitioner's sister; Nicholas Tritz, Petitioner's younger brother's best friend; and Mikayla Pena, a family friend. (ECF No. 11-11 at 41, 47, 50, 54, 58, 61-62.) These witnesses testified that Petitioner cared about children, loved the victim, and would not have hurt the victim intentionally. (*Id.* at 42-43, 49, 51, 56, 59-60, 63.) Additionally, James Parker, Scott Parker, and Pena testified that they would have spoken at the sentencing hearing if they had been asked. (*Id.* at 44, 52, 64.)

Counsel's performance at the penalty phase is measured against "prevailing professional norms." *Strickland*, 466 U.S. at 688. And the Court "must avoid the temptation to second-guess [counsel's] performance or to indulge 'the distorting effects of hindsight.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (citing *Strickland*, 466 U.S. at 689). Counsel's "performance [is] deficient only if, viewing the situation from his perspective at the time of trial, his decisions cannot be characterized as 'sound trial strategy.'" *Id.* (citing *Strickland*, 466 U.S. at 689); *see also Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008) ("[U]nder *Strickland*, we must defer to trial counsel's strategic decisions."). When challenging a trial counsel's actions in failing to present mitigating evidence during a sentencing hearing, the "principal concern . . . is not whether counsel should have presented a mitigation case[, but instead] . . . whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable.*" *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003) (emphasis in original).

Petitioner first contends that his trial counsel failed to investigate and properly mitigate the fact that his jail infractions were minor. Petitioner testified that his issues at the jail were for trivial matters, such as not having the proper footwear, having extra items, and displaying pictures. (ECF No. 11-11 at 75-76.) Petitioner's postconviction counsel, however, stated that "many of the incidents were fairly insignificant" (*id.* at 40.), which implies that there were other more serious infractions as well.

At his sentencing, Petitioner's trial counsel attempted to mitigate the jail infractions by explaining that Petitioner was incident-free for the first eight months. (ECF No. 10-8

at 8.) Thereafter, Petitioner's issues began when he was relocated to a serious-offender unit. (*Id.*) This relocation resulted in Petitioner acting in ways that were meant to protect himself. (*Id.* at 8-9.) Petitioner's trial counsel testified at the postconviction evidentiary hearing that she decided not to give too much detail about the twenty jail infractions, "a lot of [which] were minor," because if she "turned over too many rocks, more stuff comes crawling out." (ECF No. 11-11 at 30.) Although it is unclear whether Petitioner's trial counsel obtained the infraction records, it cannot be concluded that her decision to not present those records or describe them in detail was unreasonable. *Wiggins*, 539 U.S. at 522-23; *see also Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations."); *Mayfield*, 270 F.3d at 927 ("[J]udicial deference . . . is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments."). Indeed, it is clear that Petitioner made his trial counsel aware of the infractions (*see* ECF No. 11-11 at 76.) and that she used her professional judgment to conclude that detailing those records could potentially cause other harmful issues to "come[ ] crawling out." (*Id.* at 30.) Instead of detailing the infractions individually, as Petitioner apparently desired, Petitioner's trial counsel decided to ease the effect of the infractions by explaining the reasoning behind Petitioner's behavior. This decision can be characterized as "sound trial strategy." *Strickland*, 466 U.S. at 689.

Petitioner also appears to contend that his trial counsel should have presented mitigating evidence in the form of testimony from his family and friends. (*See* ECF No. 11-11 at 65, 78.) Petitioner's trial counsel explained that none of Petitioner's family and friends wanted to testify when she asked them. (*Id.* at 31-32.) Even if this is inaccurate (*see id.* at 44, 52, 64 (testimony of James Parker, Scott Parker, and Pena that they would have spoken at the sentencing hearing if they had been asked).), Petitioner's trial counsel testified that she would rather rely on letters than testimony because she does not "have control over what information" is presented when a witness is on the stand. (*Id.* at 32-

33.) This decision to present letters instead of relying on spontaneous testimony that would be subject to cross-examination was reasonable. *See Denham v. Deeds*, 954 F.2d 1501, 1505 (9th Cir. 1992) (holding that the petitioner's trial counsel was not ineffective for "elect[ing] not to call [a witness] because of 'glaring' inconsistencies in her proposed testimony," which "would have done 'more harm than good'"); *see also Minner v. Kerby*, 30 F.3d 1311, 1317 (10th Cir. 1994) ("[T]he decision of what witnesses to call is a tactical one within the trial counsel's discretion.").

In fact, Petitioner's trial counsel submitted twenty-two letters of support written by Petitioner's friends and family (*see* ECF No. 10-7; ECF No. 10-8 at 5-6) and summarized the letters by explaining that although Petitioner had "some rough edges," he was a compassionate, tender man, who loved children, especially the victim. (ECF No. 10-8 at 11-12.) The content of these submitted letters mirror the proposed testimony. (*Compare* ECF No. 10-7, *with* ECF No. ECF No. 11-11 at 41-64 (testimony of three of Petitioner's brothers, his sister, and two family friends).) Petitioner's trial counsel also explained that "almost a dozen people" traveled to attend the sentencing hearing to show their support for Petitioner. (ECF No. 10-8 at 11.) Accordingly, although the evidence was not presented in the form that Petitioner desired, Petitioner's trial counsel presented this mitigating evidence in a strategic, reasonable manner. *Harrington*, 562 U.S. at 106 ("Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach."); *see also Strickland*, 466 U.S. at 688-89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.").

In addition to determining that Petitioner's trial counsel was reasonable in her mitigation of Petitioner's jail infractions and her presentation of Petitioner's family and friends' support, it is also worth noting other areas of Petitioner's trial counsel's performance during the sentencing hearing: she attempted to weaken the effect of Petitioner's prior convictions; she highlighted the fact that Petitioner had a limited

20

education, exhibited development issues, and lacked a father figure; and she attempted to soften the evidence of the crime by explaining that Petitioner was frightened after the victim's death, that he always maintained that he never meant to intentionally hurt the victim, and that he had accepted responsibility. (ECF No. 10-8 at 7, 9-10, 12-13.) Because Petitioner's trial counsel's "representation [did not] f[a]ll below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, the Nevada Court of Appeals' ruling that "Parker failed to demonstrate his counsel's performance was deficient" regarding her representation at the sentencing hearing (ECF No. 11-33 at 4.) was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d).

Finally, Petitioner contends that his sentence was constitutionally excessive. The Eighth Amendment provides that "cruel and unusual punishments [shall not be] inflicted." U.S. Const. amend. VIII. "[B]arbaric punishments" and "sentences that are disproportionate to the crime" are cruel and unusual punishments. *Solem v. Helm*, 463 U.S. 277, 284 (1983). The Eighth Amendment does not, however, mandate strict proportionality between the defendant's sentence and the crime. *See Ewing v. California*, 538 U.S. 11, 23 (2003). Rather, "only extreme sentences that are 'grossly disproportionate' to the crime" are forbidden. *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991). "In assessing the compliance of a non-capital sentence with the proportionality principle, [the Court] consider[s] 'objective factors'" such as "the severity of the penalty imposed and the gravity of the offense." *Taylor v. Lewis*, 460 F.3d 1093, 1098 (9th Cir. 2006). "[S]uccessful challenges based on proportionality are 'exceedingly rare,' and deference is due legislative judgments on such matters." *Id.* (citing *Solem*, 463 U.S. at 289-90).

Petitioner was sentenced pursuant to NRS § 200.030(5), which provides that a second-degree murder conviction carries a punishment of imprisonment "[f]or life with the possibility of parole, with eligibility for parole beginning when a minimum of 10 years

has been served; or . . . [f]or a definite term of 25 years, with eligibility for parole beginning when a minimum of 10 years has been served." (*See* ECF No. 10-9 at 2.) Petitioner was sentenced to life with the possibility of parole after ten years. (ECF No. 10-8, 10-9.) Although the state district court sentenced Petitioner to the harsher punishment allowed by NRS § 200.030(5), it cannot be concluded that Petitioner's sentence was "'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001. As the state district court reasoned, "there has been a terrible death" of "a defenseless child." (ECF No. 10-8 at 36-37.) Indeed, the victim was a nineteen-month old boy who suffered fatal blunt force injuries to the head while in Petitioner's care. (ECF No. 9-2 at 15, 22, 148.) These facts demonstrate that "the gravity of the offense" was severe, *Taylor*, 460 F.3d at 1098, such that Petitioner's sentence does not violate the Eighth Amendment. It is also worth noting that Petitioner is eligible for parole after serving ten years. *See Rummel v. Estelle*, 445 U.S. 263, (1980) ("[B]ecause parole is 'an established variation on imprisonment of convicted criminals,' . . . a proper assessment of [a state's] treatment of [a habeas petitioner] could hardly ignore the possibility that he will not actually be imprisoned for the rest of his life."). Thus, the Nevada Supreme Court's ruling that the state district court's sentence was not improperly harsh (ECF No. 11 at 2-3.) was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d).

The Court denies Petitioner habeas corpus relief with respect to Ground Two.

## V.     CERTIFICATE OF APPEALABILITY

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). Interpreting 28 U.S.C. § 2253(c), the Supreme Court has found that "[w]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v.*

1  *McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79
2  (9th Cir. 2000). Applying this standard, the Court finds that a certificate of appealability is
3  unwarranted.

4  **VI.    CONCLUSION**

5      It is therefore ordered that the petition for a writ of habeas corpus pursuant to 28
6  U.S.C. § 2254 by a person in state custody (ECF No. 6) is denied.

7      It is further ordered that Petitioner is denied a certificate of appealability.

8      The Clerk of Court is directed to enter judgment accordingly and close this case.

9      DATED THIS 27th day of November 2019.

_____

MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE